## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MICHAEL ETZEL, individually and on behalf of all others similarly situated | ) ) ) | Case No. |
| | ) | |
| | ) | **CLASS ACTION** |
| | ) | **COMPLAINT** |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | |
| HOOTERS OF AMERICA , LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

The Plaintiff Michael Etzel ("Etzel" or "Plaintiff"), individually and on behalf of a class of all others similarly situated, files this Complaint against Hooters of America, LLC ("Hooters" or "Defendant"), showing the Court as follows:

## NATURE OF THE CASE

1.

Plaintiff brings this class action against Defendant for its violations of the Telephone Consumer Protection Act, 47 USCS § 227 (2015) ("TCPA").

2.

On January 28, 2015, Defendant initiated or caused to be initiated an unsolicited text message advertisement to the Plaintiff and each of the Members of the Class, which violated the TCPA.  The infringing text message stated as follows:

> Hooters Fans: Our mClub has moved! Don't worry, you'll still receive exclusive news, just from a new number. Reply STOP to unsubscribe Msg&Data Rates may apply.

[Exhibit 1, Text Message Example].  Hooters' mClub provides to individuals who text a Hooters' "short code" with advertisements, including periodic offers, discounts and updates on contests and promotions sent directly to that individual's cellular telephone number.

3.

The Plaintiff received this unsolicited text message advertisement, despite the fact that he did not expressly consent in writing to receive it. The unsolicited text message advertisements sent to Plaintiff is representative of the text messages sent to the Class Members, who likewise did not expressly consent in writing to receiving them.  The text messages were sent to advertise the goods or services of Defendant Hooters.

4.

The text messages were sent via short message service ("SMS") text messages and/or multi-media service ("MMS") text messages containing SMS-like text messages (hereinafter, "text messages").  The text messages were sent to telephone numbers assigned to a cellular telephone service.

5.

The text messages were sent to the Plaintiff and Members of the Class via an automatic telephone dialing system ("ATDS"), which is prohibited by the TCPA. This device had the capacity to send pre-recorded voice or text messages to thousands of telephone numbers in a day and did, in fact, do so. The device could send these messages to pre-programmed lists or databases, sending the messages via automated means to thousands of persons, as here.  The device could also store and produce a random or sequential set of numbers, and send messages to the same.  An ATDS includes a "predictive dialer."  The form text messages were sent to Members of the Class as well as the Plaintiff, which is indicative of the use of an ATDS.

6.

The text messages violated the TCPA, which prohibits initiating, or causing to be initiated, a call to any telephone number assigned to a cellular telephone service using an ATDS without the prior express written consent of the called party, with

limited exceptions such as emergency calls that are not applicable here. 47 USCS § 227(b)(1). A text message, such as those at issue in this case, qualifies as a "call" within the meaning of the TCPA.

7.

The TCPA permits any person to bring an action based on a violation of this section for the recovery of actual monetary loss *or* $500 in damages for each violation, whichever is greater. The TCPA further increases the statutory penalty for violations to $1,500.00 if the Defendant acted willfully or knowingly in violation of the TCPA.

8.

The Defendant acted negligently, willfully, and knowingly in violation of the TCPA. The Defendant had been warned expressly *not* to send the messages because they violated the TCPA.  Despite the express warning, the Defendant sent the text messages anyway.

9.

Accordingly, Plaintiff, individually and on behalf of the Class, asserts a claim against Defendant for violation of the TCPA and recovery of the statutory fine in the amount of $500 or $1500, if knowing or willful, per text message.  The Plaintiff,

individually and on behalf of the Class, also seeks an injunction to prohibit the Defendant from sending the infringing messages in the future.

## JURISDICTION AND VENUE

### 10.

This Court has diversity jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual Class members exceed the sum or value of $5,000,000, exclusive of interests and costs. Further, Plaintiff and many Class members are citizens of a different state than the Defendant.

### 11.

This Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this claim involves a violation of a Federal Statutory Right.

### 12.

This Court has personal jurisdiction over Defendant Hooters because Defendant Hooters maintains its principal place of business in Georgia, is a Georgia limited liability company, is registered to conduct business in Georgia, and has sufficient minimum contacts in Georgia.  Defendant Hooters intentionally avails itself of the Georgia consumer market through the promotion, sale, marketing, and distribution of its products to Georgia residents.

13.

Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because, among other things, Defendant Hooters' principal place of business is in this District in Georgia and a substantial part of the events giving rise to the Plaintiff's claims occurred in Georgia.

## PARTIES

14.

Plaintiff, Michael Etzel, is a citizen and resident of Glendale, Wisconsin.

15.

Plaintiff received one of the thousands of text messages on or about January 28, 2015, that Defendant initiated or caused to be initiated in violation of the TCPA. Plaintiff and each member of the Class are entitled to recover the statutory penalty for each violation in the amount of $500 or $1,500, if found to be willful, knowing, or intentional. Plaintiff seeks to recover a fine in this amount for each infringing text message sent to the proposed class members.

16.

Defendant Hooters is a Georgia Limited Liability Company with its principal place of business at 1815 The Exchange Southeast, Atlanta, Georgia, 30339, in Cobb County, Georgia. Defendant Hooters maintains its registered agent for service of

process as Claudia Levitas, 1815 The Exchange Southeast, Atlanta, Georgia, 30339, in Cobb County, Georgia. Defendant Hooters is, therefore, subject to the jurisdiction and venue of this court.

## **FACTUAL BACKGROUND**

### 17.

On or about January 1, 2015, Defendant Hooters contracted with a company named SilverPop Systems, Inc. ("SilverPop"), to send advertising text messages in mass to a list of telephone numbers provided to SilverPop by Hooters. At all times relevant to this Complaint, SilverPop specialized in providing automated text message services on behalf of other companies. The SilverPop website indicates that it has the capacity to "automate SMS message and response campaigns…." [Exhibit 2, Website print-out].

### 18.

SilverPop uses an ATDS to initiate calls to cellular telephone numbers and deliver text messages, and is paid by its clients for these services to do so, and was paid by Hooters for these services.

### 19.

The SilverPop ATDS is a system of computers which is set-up to deliver thousands of text messages, in a short amount of time. The ATDS also includes

routers which route traffic between the computers to permit transmission of the text messages as quickly as possible.  The ATDS automatically, and without human involvement, dials telephone numbers and sends pre-recorded text messages to thousands of cellular telephone numbers. While the SilverPop ATDS has the capacity to generate a randomized list of telephone numbers to which it can send pre-recorded text messages, in this case, the SilverPop ATDS called thousands of cellular telephone numbers from a pre-programmed list or database.

20.

Defendant Hooters obtained the list of cellular telephone numbers that it provided to SilverPop through an approximately 6-year marketing campaign, during which it requested at its restaurants and elsewhere that customers "opt-in" to Short Code "36832" in exchange for receiving advertising or telemarketing text messages about periodic offers, discounts and updates on contests and promotions.

21.

Throughout this 6-year marketing campaign period, Hooters text messaging services were provided by State of Text, Inc. ("State of Text"), another company specializing in ATDS communications.  Hooters advertised in its restaurants with large posters requesting customers to text a phrase to Short Code "36832," to obtain periodic offers, discounts and updates on contests and promotions from Hooters.

22.

For example, in conjunction with this advertising campaign Hooters ran the following advertisement campaign:



Persons who texted the advertised Short Code, 36822, were automatically enrolled in Hooters mClub and received periodic advertising text messages from Hooters via an ATDS.

23.

State of Text received the text messages sent to the Short Code by Hooters' customers. State of Text maintained and was responsible for maintaining the database of customers' cellular telephone numbers to be used in future Hooters ATDS advertising text message campaigns.

24.

In addition, State of Text received the "opt-out" text messages from Hooters' customers, withdrawing their consent to receive future text message advertisements from Hooters. State of Text maintained and was responsible for maintaining a database with the cellular telephone numbers that included the "opt-in" and "opt-out" dates for these customers.

25.

The Plaintiff opted-in to Short Code 36832. However, well before January 28, 2015, the Plaintiff expressly opted-out of the Short Code by sending a "STOP" message to Short Code 36832, revoking any consent to receive future text messages from Hooters. Thousands of class members also opted out of the Short Code by sending the same or a similar message, before January 28, 2015, revoking any consent to receive future text messages from Hooters.

26.

Furthermore, effective October 16, 2013, the Federal Communications Commission ("FCC"), which is responsible for establishing rules and regulations enforcing the TCPA, ruled that an automated call (such as a text message) could not be sent without the "prior express written consent" of the recipient to receive the text message advertisement.  27 F.C.C.R. 1830, 1837, para. 18, 20, 71 (2012).  Defendant

did not obtain the express prior written consent of the Plaintiff, or thousands of additional Class Members, prior to sending the January 28, 2015 text message advertisement.

27.

In October of 2013, in accordance with the FCC's ruling detailed in the prior paragraph, Hooters directed State of Text to send a message to the entire database of cellular telephone numbers requesting the express written consent to receive future text messages, which stated:

> Hooters: Lets stay friends! Reply Y to continue up to 8 automated msgs/mo. Data&MsgRatesApply. Consent 2 get txts not reqd cond 4 purchase. STOP to end.

Thousands of persons did *not* reply "Y" to consent to receive future text messages from Hooters. State of Text, accordingly, noted these persons as "opt-outs" in its database.

28.

On or about December 23, 2014, Hooters requested the database of cellular telephone numbers from State of Text.  Hooters indicated that it wanted the list for the purported purpose of comparing the numbers maintained by State of Text with the numbers obtained from customers signing up for the mClub via its website and elsewhere and remove any duplicate cellular telephone numbers.  As the email to

State of Text from Bruce Skala, Vice President, Marketing and Beverages for

Hooters states:

> Sean,
>
> We are working on consolidating our text, email and Hoot Club databases. Pease send us the text database information by store. I appreciate your assistance.
>
> Bruce Skala

[Exhibit 3].

29.

Upon receiving the aforementioned email, State of Text requested that

Hooters provide clarification as to whether it intended to send text messages to these

numbers, as it could result in a violation of the TCPA if the "opt-outs" were included.

As the email from Sean McKesson on behalf of State of Text states:

> Hey Bruce, due to the legal liability of delivering cell phone numbers that were obtained on 36832 leased short code. I need to ask if you are continuing on 36832 short code to deliver sms messages or were you looking to transitions [sic] to another?
>
> Due to the nature of this we don't want another lawsuit opening up based off of TCPA regulations and CTIA best practices violations. …
>
> Thanks,
>
> Sean McKesson

[Exhibit 3].

30.

Chris Duncan, Hooters' Chief Information Officer, then clarified to State of Text that Hooters was solely "trying to run a comparison of eClub, HootClub and text." [Exhibit 3].

31.

Upon receiving this false assurance from Hooters that it would not text these numbers, State of Text provided the requested list of cellular telephone numbers to Hooters which included each number's opt-in or opt-out dates. This list of cellular telephone numbers did not, however, include the area codes for the cellular telephone numbers. State of Text removed the area codes; this act served as a precaution to prohibit Hooters from sending text messages to those persons who had not consented. [Exhibit 4].

32.

Upon receiving the list with the removed area code numbers, Chris Duncan, CIO for Hooters, emailed State of Text, stating that he could not "convert th[e] number[s] to a phone number…." [Exhibit 4].  Duncan, then, requested that State of Text provide Hooters with the entire cell phone number, including area code. Duncan indicated that Hooters received too many "false positives" in comparing the State of Text list with its website and other lists.

33.

On December 24, 2014, Chris Duncan, the CIO for Hooters, replied to State of Text, confirming that Hooters would *not* text the numbers.  As Duncan stated "we really need the whole number [to get a solid figure on duplicates]. ***We're not going to text to these numbers***."  Accordingly, Defendant Hooters recognized that it would be a violation of the TCPA to send text messages to these telephone numbers with an ATDS. [Exhibit 5, (emphasis supplied)].

34.

State of Text supplied Hooters with the list of the entire cell phone numbers. State of Text removed the "opt-in" and "opt-out" dates from the data. In the email, State of Text warned Hooters that "it would be illegal" to send text messages to these persons because the "short code eod ["End of Date" or "opt-out"] registration" had been removed.  [Exhibit 6].

35.

On December 31, 2014, Hooters terminated its contract with State of Text and engaged Defendant SilverPop, as its ATDS text message provider.

36.

As the business relationship was ending, State of Text sent yet another reminder via e-mail to Defendant Hooters, including to its CIO Duncan, for Hooters

not to send out messages using the cellular telephone numbers on the list, as it included numbers for people who had not consented to receiving further messages from Hooters:

> Just a reminder not to send out messages to the database of numbers we provided to you on any other short code. The list is unusable because it does not contain opt in or opt out dates and will open up legal grounds against HOA by its SMS/Text clients again.

[Exhibit 7].

## 37.

Despite State of Text's warnings, and despite Hooters' express promise "we're not going to text to these numbers" on or about January 28, 2015, Defendant Hooters through its new ATDS provider, SilverPop, used the list, sending a text message to the Plaintiff and thousands of class members who had not provided their express written consent to receive such text messages. The message read as follows:

> Hooters Fans: Our mClub has moved! Don't worry, you'll still receive exclusive news, just from a new number. Reply STOP to unsubscribe Msg&Data Rates may apply.

[Exhibit 1, Text Message Example].

## 38.

In response to receiving this unsolicited and improper text message, on or about January 29, 2015, Plaintiff sent an email to Defendant Hooters stating:

I had previously used the text services/short codes.  I have been opted out for some time and have received new texts from Hooters.  I do not understand why I am now receiving texts from Hooters again.  I feel like this is an invasion of my privacy as I have already requested to be removed.  I am very unhappy with that I have to deal with this again.

[Exhibit 8].

39.

On January 29, 2015, CIO Duncan on behalf of Defendant Hooters admitted to Plaintiff that the illegal text messages were sent:

The company that we previously paid to do our text marketing provided us with an erroneous list of subscribers when we moved away from their services at the end of last year and we apologize as our new partner sent out to the list. We've removed your phone number (as well as all that we now know were given to us erroneously) from all systems and apologize for your inconvenience.

[Exhibit 8].

40.

In addition to admitting wrongdoing, CIO Duncan on behalf of Defendant Hooters also mischaracterized the facts, as Defendant Hooters has warned numerous times not to text this list and Defendant Hooters had, in its possession, the number of people that had not consented to Hooters' texting at least current as of November 2014.

41.

Defendant Hooters has, in its possession, a copy of the list of the customers that were sent text messages in violation of the TCPA on January 28, 2015. This list is readily accessible to Defendant Hooters and clearly identifies each Class Member's cellular telephone number.

42.

Upon information and belief, State of Text also has, in its possession, a copy of the list of the customers that Hooters sent text messages in violation of the TCPA on January 28, 2015. This list is readily accessible to State of Text and clearly identifies each Class Member's cellular telephone number.

43.

Throughout all the times referenced herein, SilverPop, the entity that sent out the messages at Hooters' behest acted as Defendant Hooters' agent. Defendant Hooters ratified SilverPop's actions and maintained control over SilverPop's actions at issue this case. Defendant Hooters is vicariously liable for all of SilverPop's actions at issue in this case.

44.

Defendant acted negligently, recklessly, knowingly, and willfully in sending the text messages on or about January 28, 2015 to Plaintiff and other members of the class.

45.

As a proximate consequence of Defendant's acts and omissions herein, Plaintiff and thousands of other members of the class received unsolicited text message advertisements from Hooters which injured the Plaintiff and other members of the class, and they are entitled to recover the statutory penalty, and to injunctive relief.

## CLASS ACTION ALLEGATIONS

46.

Plaintiff brings this action pursuant to Rule 23(a), 23(b)(1), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as follows:

> All persons in the United States of America (including its Territories and the District of Columbia) who were sent, without prior express written consent, to their cellular telephone numbers, at least one text message on or about January 28, 2015 which marketed and/or

advertised the Hooters' mClub, or Hooters services, products, or goods (the "Class").[1]

47.

Excluded from the Class are: Hooters of America, LLC, SilverPop, and their respective, affiliates, employees, officers and directors, the judge(s) assigned to this case, and the attorneys of record in this case.

48.

The members of the Class are readily ascertainable. The cellular telephone number of each individual receiving the illegal communications is in the records of the Defendant.

49.

The members of the class are so numerous that joinder of all members is impracticable.  While an exact number of class members is unknown at this time and can only be ascertained through appropriate discovery, upon information and belief, there are more than one thousand members in the Class.

---

[1] Plaintiff may amend the Class definition as new details emerge as to whom the infringing text messages were sent.

50.

There are common questions of law and fact that predominate over any questions solely affecting individual members of the Class.  These common legal and factual questions include, but are not limited to, the following:

a.  Whether Defendant's conduct violated the TCPA;

b.  Whether Defendant acted willfully, knowingly, or intentionally;

c.  Whether the Defendant should be enjoined from its conduct; and,

d.  The amount of statutory damages that the Defendant must pay for each of the unsolicited text message advertisements sent in violation of the TCPA.

51.

Plaintiff's claims are typical of the claims of the other Class Members.  Both the Plaintiff and the Class Members' claims arise from the same actions of the Defendant and are based on the same legal theories.

52.

Plaintiff will fairly and adequately assert and protect the interests of the members of the Class. In addition, Plaintiff has retained counsel who are experienced and qualified in prosecuting class action cases similar to this one.  Neither Plaintiff nor their attorneys have any interests contrary to or conflicting with other Class Members' interests.

53.

A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the other Class Members' claims is economically infeasible and procedurally impracticable. As the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it impossible for Members of the Class to individually address the wrong done to them. Class Members share the same factual and legal issues and litigating the claims together will prevent varying, inconsistent, or contradictory judgments, and will prevent delay and expense to all parties and the court system through litigating multiple trials on the same legal and factual issues. There will be no difficulty in the management of this action that would preclude its maintenance as a class action.

## **COUNT I: VIOLATION OF THE TCPA**

54.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 53 as if restated herein verbatim.

55.

At all times material hereto, Plaintiff and the Class have been entitled to the rights, protections, and benefits provided under the TCPA, 47 USCS § 227.

56.

Defendant engaged in acts, omissions, and/or other conduct that violates the TCPA, including but not limited to violation of subsection (b) of the TCPA.

57.

In particular, Defendant violated the provisions of the TCPA by sending thousands of unsolicited, text message advertisements to the cellular telephone numbers of the members of the Class on or about January 28, 2015.

58.

Although the TCPA is a strict liability statute, in violating the TCPA, the Defendant acted negligently, recklessly, willfully, knowingly, and intentionally.

59.

Pursuant to the TCPA (b)(3), the Plaintiff and the members of the Class are entitled to recover $500 in damages from the Defendant for each violation of the TCPA, meaning each individual text message.

60.

Further, because the Defendant willfully and knowingly violated the TCPA subsection (b), the Plaintiff and the Members of the Class are entitled to treble damages, or $1,500.00 for each violation of the TCPA, meaning each individual text message.

## COUNT II: INJUNCTION

### 61.

Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 53 as if restated herein verbatim.

### 62.

At all times material hereto, Plaintiff and the Class have been entitled to the rights, protections, and benefits provided under the TCPA, 47 USCS § 227.

### 63.

Defendant engaged in acts, omissions, and/or other conduct that violates the TCPA, including but not limited to violation of subsection (b) of the TCPA.

### 64.

In particular, Defendant violated the provisions of the TCPA by sending thousands of unsolicited, text message advertisements to the cellular telephone numbers of the Members of the Class on or about January 28, 2015. Thus, the facts are clear that the actions sought to be enjoined are in violation of federal law.

### 65.

In the event that an injunction is granted, the Defendant will suffer no excessive harm as they will only be prohibited from engaging in an illegal action.

66.

An injunction would prohibit violations of the TCPA in the future.

67.

An injunction would serve the policy of judicial efficiency by eliminating the need for future and multiple litigations on the issues under investigation herein.

68.

This Court has broad authority to restrain acts, such as here, which are unlawful.

69.

Accordingly, this Court should grant the Plaintiff and the Class Members a permanent injunction, enjoining the Defendant from texting the Class Members and the Plaintiff again in violation of the TCPA.

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in its favor as follows:

A. Certifying the Class and appointing Plaintiff and his counsel to represent the Class;

B. Enjoining Defendant from improperly sending text messages to the Plaintiff and the Class Members;

C. Awarding Plaintiff and the Class statutory damages in the amount of $500 per text message sent in violation of the TCPA;

D. Increasing the award to the Plaintiff and the Class of statutory damages in the amount of $1500 per text message sent in knowing or willful violation of the TCPA;

E. Awarding Plaintiff and the Class pre-judgment and post-judgment interest;

F. Awarding Plaintiff and the Class reasonable attorneys' fees and costs of suit; and

G. Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted, this 8th day of April, 2015

**W. PITTS CARR & ASSOCIATES**

By: *s/ Pitts Carr*
W. Pitts Carr
Georgia Bar No. 112100
Alex D. Weatherby
Georgia Bar No. 819975
10 North Parkway Square
4200 Northside Parkway NW

Atlanta, GA 30327
Tel: (404) 442-900
Fax: (404) 442-9700
pcarr@wpcarr.com
aweatherby@wpcarr.com

Nicholas P Panayotopoulos
Georgia Bar No. 560679
Nan Rigby
Georgia Bar No. 605453
**WEINBERG WHEELER
HUDGINS GUNN & DIAL**
3344 Peachtree Road NE
Suite 2400
Atlanta, GA 30326
404-832-9540 phone
404-875-9433 fax
NPanayo@wwhgd.com
NRigby@wwhgd.com

David Ghattas
Georgia Bar No. 292457
**Law Office of David Ghattas**
1265 Seven Springs Circle
Marietta, GA 30068
Phone: (404) 643-1249
dghattas1@aol.com

*Attorneys for Plaintiff and the Proposed Class*